PENDLETON, President.
On this occasion we are referred to the case of Hooe & Harrison v. Oxley & Hancock, 1 Wash. 19, as a case where the principles are established which direct the present decision. We have revised that case, and approve, as well of the general principles laid down, as of the application of them to that case,* and if those principles apply equally to the present case, the same decree will be made, which makes it necessary to compare the circumstances of the two cases.
Both powers are of the second class mentioned in that case; limited as to the object, or the business to be done, and the agent left at large as to the mode of transacting it. In that ease the business of Ponsonby was to procure consignments of tobacco to Oxley Co. shipped on board their vessels; to facilitate which, he was empowered to make advances to the shippers, and for that purpose, to draw bills of exchange on Oxley 8¡" Co. which they promised should be duly honored. In this respect, that cáse is mistated in the outset, that he was authorised to purchase tobacco; but, the mistake is corrected in the opinion of the Court. The bills in that case, were drawn for the tobacco purchased to load the Lady Johnson, and shipped on board her by Ponsonby himself, consigned to Oxley & Co. when other consignments were not to be procured for her loading; so that the principal purposes were answered; namely, that of loading their vessel, and entitling them to commissions for the sale of the tobacco. . The only difference was, that in case the tobacco did not produce the amount of the advance, he would become their debtor for the difference, instead of many correspondents; and they left the opportunity of engaging such correspondents in future: Which being of an inferior nature to the other, it was doubted whether Posonby was not within the strict limits .of his agency, so as to entitle him to his damages against Oxley, for having protested his bills, if the case had come on as between them; especially, as by their letter of November the 30th, 1784, with full information before them of what he had done, they seemed to confirm it, but forbid its being repeated.
In this case, if the cause had come on between Hunter and Blane, it would not admit of a moment’s doubt. The *326 bills were drawn for the purchase of tobacco, not authorised by the power, nor applied to the use of Blane, either as a remittance, or for the despatch of his vessels: it is consigned to merchants at Havre de Grace, not named in the power, and the proceeds advanced to Mr. Hunter here, and applied in the purchase of produce and payment of his debts. The produce not stated, to be that of grain sent to Mr. Blane, was to bring it, by a circuitous operation within the power.
We then compare the case of the bill-holders. Ponsonby had been from May, 1783, in the exercise of his power of loading Oxley’s vessels and in the habit of drawing bills for advances to the shippers, and his power communicated in a circular letter, written to engage correspondents. However, in the infancy, his power to draw was not so notorious; and an endorser was in some instances required. Mr. Smith endorsed one of his bills; of which Mr. Smith informs Oxley by letter in September, 1783, taking notice, that Ponsonby had applied to him to endorse his bills on them, to get money to advance to the shippers; and that he had endorsed one. In answer to this letter, they thank Smith for his assistance to Ponsonby, whose bills on them they say will meet due honor: A general expression, not confined to that particular bill, but to Ponsonby’s bills generally, which continued to. be frequently drawn, and as constantly paid; until those in dispute were drawn, circumstanced as before stated, in fall 1784, and were protested.
In the present case, the bills were drawn in the commencement of the agency; when the agent’s power to draw had gained no accession from his habit of drawing, and Blane’s of paying; and, therefore, must depend on the power itself, and the circumstances under which Mr. Hopkins received the bills; that is to say, whether he took them upon the credit of Hunter himself, or was induced to take them on the credit of Blane, from a well founded opinion that he was bound to pay them? It was laid down by the appellant’s counsel, that bills of exchange are purchased upon the credit of the person on whom they are drawn; but this as a general position is not correct: they are generally taken on credit of the drawer, which, if doubted, is fortified by an endorser, the drawee not being bound until his acceptance; and then the drawer is not discharged till actual payment, unless by delay the holder gives credit to the accepter, and so loses the other resort
*327 We suppose the counsel only meant the case of a bill drawn by an agent on his principal, pursuant to his power given to draw, and to such bills the observation applies. That these bills were not within the letter or spirit of the power, has been stated; and whether Mr. Hopkins was induced to take them, on' a supposition that they were drawn to procure money to fulfil the purposes of the agency, by circuitous operation, depends upon the circumstances.attending the negotiation.
That Hunter shewed these letters to some persons to whom he wished to sell bills, as a proof of his power to draw, is proved, but this would seem to be after these bills were drawn; which Scott proves to have been the first drawn by Hunter, after the receipt of the letters. That they were shewn to Mr. Hopkins at the time, is not otherwise proved than by his own declaration to Watson; when made, does not appear, nor is it material, since, whatever credit may be privately due to the assertions of that gentleman, they are not here to be taken for proof. It might be, that Hunter found it unnecessary to shew those letters; since his bills might pass to Mr. Hopkins upon his oten credit as a merchant, with whom Mr. Hopkins had had former dealings, and been in intimacy. The accounts be; tween them, with Mr. Hopkins’s subsequent letters, make a strong impression that this was really the case, and the bills, taken upon Hunter’s credit; the powers, from JBlane, being only now resorted to, when Hunter’s insolvency would otherwise occasion a loss of the money.
Whether the bills were at first taken absolutely, or oh trust, to be sold for Hunter, and whether the exchange was fixed or left to depend upon what they would sell for, seems quite immaterial to Blane, and, therefore, need not be considered. One circumstance drawn from the correspondence though, seems of weight. If Mr. Hopldns took these bills upon the credit of Blane, it was certainly his duty, upon the general principle of negotiation, to have presented them to Blane, or given him early notice of them, to enable him to regulate his conduct as to the agency of Hunter;, for want of which, he might have paid other bills which he would have refused, if he had known himself bound to pay these bills: or finding his agent abusing his confidence, he might have put an end to his powers at an earlier period. * But these bills received the 22d of *328 February, remained in Mr. Hopkins’s hands, for reasons disclosed in the correspondence with Hunter, at least till May the 4th, the date of Mr. Hopkins’s last letter, and probably longer, since by the note at the foot of the bill, they do not appear to be presented till the 31st of Augusts and that is the first notice which Blane had, of their being drawn. There seems to be the same reason for diligence in the application to Mr. Blane, if he was chargeable in this case, as there is for the like diligence to charge the drawer, when he is to be made liable for want of acceptance and payment. The form of the bill too, directs the money to be charged to the account of Hunter, instead of directing it to be placed to account of grain purchased for your use by me as your agent; a circumstance, which ought in these cases to be observed; in order to show, on whose credit the bills were drawn, and to avoid disputes of the present nature. But, as this is not always attended to, and was not observed in Oxley’s Case, it would not alone have weight; yet, it has some, when added to the other circumstances. The accounts shew thattheplaintiff and Hunter had dealings together as ordinary merchants; an account of which was settled in December, 1789. The balance begins the account, in which are added sundry articles of debit and credit, undoubtedly of a private nature; and with these are intermixed a debit for the tobacco and the credit for the bills, differing in amount; and, although that difference is only 61. 15s. 9d., it is yet a circumstance to shew that those articles were not a separate independent dealing.
The correspondence confirms the idea of the bills having been taken from Hunter in his private cupacity, and notin his agency; since not a word or hint is given of Blane’s having any concern in them, in any of the letters.
When we return to the accounts, there are two which agree; the 1st annexed to Blane’s answer, the other I suppose introduced by Mr. Hopkins, making a balance of 248/. 4s 9d. due to him. There is a third account with the same articles and making the same balance; which being made an article of debit, this article is added, “to bills of exchange on Thomas Blane, returned protested with costs 560/. 6s. 9d. making .808/. 11s. 6d\” and this account, so far, has the name of Mr. Hopkins, October 9, 1790, the same date of the other two. Then follow several credits, amounting to 375/. 1 Is. Id. which would leave a balance of 432/. 19s. 10id. only due from Hunter, shewing 127/. 6s. 10-J-c?. to have been paid him in part *329 of the bills; and this would evince further, that Mr. Hopkins, after the protest, considered Hunter as his debtor. But at the foot is a certificate of Mr. Scott’s, that “ the above is a true statement oí'John Hopkins’s account as it stands on the hooks of the late William> Hunter;” which creates a doubt, whether the debit of the protested hills as well as the latter credits were not taken from Hunter’s books, so as to do away the influence of Mr. Hopkins’s having made it a debit in his account; and that circumstance is disregarded.
But, another circumstance has considerable weight; namely, that although these bills were protested on the 2d of November, 1790, Mr. Hopkins does not appear to have made any application to Mr. Blane until May, 1793; when he commenced this suit: Which evinces, that during that time he relied on Mr. Hunter; thus depriving Mr. Blane of an opportunity of pursuing a remedy against Hunter, as he might have done, if a demand had been made at an earlier period, by Mr. Hopkins. Upon the whole circumstances then, we are of opinion, that Mr. Hopkins took these bills upon the credit of Mr. Hunter, {unconnected with his agency for Blane;) and not upon the credit of Blane in consequence of that agency.* Therefore, upon general principles, as well as in conformity to the decision in Oxley’s Case, we are unanimously, for affirming the Chancellor’s decree, dismissing the bill.

[* In Blane v. Proudfit, 3 Call, 214, Lyons, J. delivering the opinion of the Court, said 6i That case carried the principle of responsibility far enough, and we are not disposed to push it any further.”]

[* For the general rule as to the period of presentment, see Muilman v. De Eugino, 2 H. Bl. 565; Goupy et al. v. Harden, et al. 7 Taunt. 159. Fry v. Hill 7 Taunt. 397.]

[* See Blane v. Proudfit, 3 Call, 207.]